UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 17-22604-CIV-GAYLES/OTAZO-REYES

MILKA ELENA CASTRO,

      Plaintiff,

v.

NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court upon Plaintiff Milka Elena Castro's ("Claimant")
Opening Brief in Support of Her Motion for Summary Judgment (hereafter, "Claimant's Motion
for Summary Judgment") [D.E. 17] and Defendant Nancy A. Berryhill, Acting Commissioner of
Social Security's ("Commissioner") Motion for Summary Judgment (hereafter, "Commissioner's
Motion for Summary Judgment") [D.E. 22].  The administrative transcript (hereafter, "TR.") has
been filed [D.E. 13].[1]  For the reasons stated below, the undersigned respectfully recommends
that Claimant's Motion for Summary Judgment be DENIED, the Commissioner's Motion for
Summary Judgment be GRANTED, and the Commissioner's decision be AFFIRMED.

## PROCEDURAL HISTORY

Claimant filed an application for disability insurance benefits ("DIB") and an application
for supplemental security income ("SSI") on August 22, 2013, alleging a disability onset date of
May 31, 2013.  TR. 209-21.  The application was denied initially and upon reconsideration.  Id.
at 97-98, 127-28.  Upon Claimant's written request, a hearing was held on May 11, 2016 before

---

[1] The references hereafter (TR. ___) are to the transcript pages rather than the court record pages.

Administrative Law Judge Tracey B. Leibowitz ("ALJ Leibowitz"), at which Claimant and

Vocational Expert Nicholas Fidanza ("VE Fidanza") testified. Id. at 39-67, 155.  On June 7,

2016, ALJ Leibowitz issued an Unfavorable Decision, finding the following:

(1) Claimant met the insured status requirements of the Social Security Act through December 31, 2017. Id. at 21.

(2) Claimant had not engaged in substantial gainful activity since May 31, 2013, the alleged disability onset date (20 C.F.R. § 404.1571 et seq. and 416.971 et seq.). Id.

(3) Claimant had the following severe impairments: mild lumbar degenerative disc disease at L5-S1; left foot plantar fasciitis; bilateral knee cartilage loss; osteoarthrosis; status-post left knee cystic mass excision and left knee meniscus tear repair; depression; obsessive-compulsive disorder; and anxiety (20 C.F.R. §§ 404.1520(c) and 416.920(c)). Id.

(4) Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). Id. at 22.[2]

(5) Claimant had the residual functional capacity (hereafter, "RFC") to perform sedentary work subject to additional limitations. Id. at 24.[3]

(6) Claimant was unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965). Id. at 31.[4]

(7) Claimant was born on August 10, 1973 and was 39 years old, which was defined as a younger individual aged 18-44, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963). Id.

---

[2] The Social Security Administration's ("SSA") Listing of Impairments "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a) and 416.925(a).

[3] The RFC is the ability of a claimant to do physical and mental work activities on a sustained basis, despite the claimant's limitations or impairments. 20 C.F.R. §§ 404.1545(a)(1) and 416.945(a)(1). The RFC must be determined based on all of the claimant's impairments, even those that are not considered "severe." See 20 C.F.R. §§ 404.1520, 404.1545, 416.920 and 416.945.

"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a) and 416.967(a).

[4] "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. §§ 404.1560(b)(1) and 416.960(b)(1).

(8)  Claimant had a limited education and was able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).  Id.

(9)  Transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Claimant was "not disabled," whether or not Claimant had transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).  Id.[5]

(10) Considering Claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Claimant could perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).  Id.

(11) Claimant had not been under a disability, as defined in the Social Security Act, from May 31, 2013,  through the date of the Unfavorable Decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).  Id. at 33.

On June 9, 2017, the Appeals Council denied a request for review of ALJ Leibowitz's Unfavorable Decision.  Id. at 1-8.  On July 12, 2017, pursuant to 42 U.S.C. § 405(g), Claimant filed this action seeking reversal of ALJ Leibowitz's final administrative decision [D.E. 1].

In support of her contention that ALJ Leibowitz's Unfavorable Decision should be reversed, Claimant argues that:

I.     The ALJ failed to properly assess opinion evidence of record.

II.    The ALJ's RFC assessment was not supported by substantial evidence.

III.   The ALJ did not properly assess Claimant's credibility.

See Claimant's Motion for Summary Judgment [D.E. 17].  The undersigned finds no merit in any of these contentions.

---

[5] SSRs are a series of precedential decisions relating to the programs administrated by the SSA and are published under the authority of the Commissioner of Social Security.  See http://ssa.gov/regulations/def-ssr.htm.

## RELEVANT MEDICAL EVIDENCE

### I.      Physical Health Providers

#### A.  Treating Sources

##### 1)  New Life Medical Institute ("New Life")

Claimant received treatment at New Life from May 28, 2010 to July 3, 2013.  TR. 283-337.  From January 10, 2012 to June 27, 2013, Claimant was repeatedly diagnosed with hypertension, asthma/chronic obstructive pulmonary disease ("COPD"), gastroesophageal reflux disease ("GERD") and migraines.  Id. at 289-95.

On May 28, 2010, Claimant underwent x-ray examinations of her elbows, chest, and left knee, and ultrasounds of her carotid and thyroid, which were all normal or unremarkable.  Id. at 308-12.  On September 30, 2010, Claimant underwent an x-ray examination of her right knee, which showed severe osteoarthritic changes; and x-ray examinations of her right elbow and right shoulder, which were normal.  Id. at 315-17.  On November 9, 2010, Claimant's chest x-ray was normal.  Id. at 319.  On January 7, 2011, she returned to New Life for another chest x-ray and thyroid ultrasound, both of which were normal.  Id. at 318, 323.  On March 11, 2011, Claimant underwent an echocardiogram which was normal.  Id. at 324-25.  On January 10, 2012, Claimant had a lower extremities arterial study and ultrasounds of the liver, gallbladder and pancreas, which were all normal.  Id. at 331-32.  She returned for another thyroid ultrasound on March 23, 2012, which was normal.  Id. at 333.

##### 2)  University of Miami Hospital ("UM Hospital")

Claimant received treatment at UM Hospital from August 31, 2011 to October 30, 2015.  Id. at 352-66, 457-534, 617-624.  On June 4, 2013, Claimant underwent a left knee medial meniscus tear repair and excision of cystic mass from her left knee at UM Hospital.  Id. at 353-

59.   That same day she had a chest x-ray examination, which showed no active pulmonary disease, cardiac decompensation, pneumonia, or pleural effusion.  Id. at 366.

On September 3, 2013, Claimant complained of intermittent lower back pain for the past year and rated it 8/10.  Id. at 522.  Claimant returned to UM Hospital on September 26, 2013 complaining of continued bilateral lower back pain and some numbness and tingling in her legs. Id. at 510.  She stated that she was able to manage her pain with medication.  Id.  On that day, she had a spinal x-ray examination, which showed grade 1 anterolisthesis at L5-S1, but was otherwise normal.  Id.  On October 10, 2013, she underwent an MRI examination that showed minimal degenerative changes of the lower lumbar spine.  Id. at 509.  Upon physical examination that day, she had a normal gait with 5/5 muscle strength in all of her extremities and full range of motion with no tenderness or subluxation in her upper or lower extremities.  Id. at 512.  On October 15, 2013, Claimant's physical examination showed that she had 5/5 muscle strength in her upper and lower extremities and full range of motion with pain in her lower spine.  Id. at 503. She reported that she managed her back pain with Ibuprofen that she did not need to take every day. Id. at 501.  On November 19, 2013, Claimant rated her lower back pain as 0/10 and stated that she experienced lower back pain and right leg numbness intermittently.  Id. at 472.  Her lumbar range of motion and upper and lower extremity strength were normal, and she had full range of motion in both the upper and lower extremities with no laxity, tenderness, or subluxation.  Id. at 474.

As to the issues with her left foot, a July 25, 2013 x-ray examination of the left foot revealed a 2 mm plantar calcaneal spur.  Id. at 365.  On September 10, 2013, Claimant underwent an ultrasound of her left foot, which revealed acute plantar fasciitis, and she was treated with a steroid injection.  Id. at 361-64.   On January 23, 2014, Claimant reported

experiencing left foot pain for the last two years and stated that the pain was rated 10/10 and was not relieved by physical therapy or steroid injection. Id. at 576. That day she underwent an MRI of her left foot, which revealed severe plantar fasciitis. Id. at 574. On January 31, 2014, she underwent an ultrasound-guided plantar fascia debridement. Id. at 460. On February 14, 2014, she received an ultrasound of her left foot, which revealed decreased edema and a positive result from the debridement. Id. at 459.

3)      Gregory Fox, M.D. ("Dr. Fox")

Claimant was treated by Dr. Fox from February 21, 2014 to September 18, 2015. Id. at 582-607. At her initial appointment, Claimant reported having a complicated thyroid issue and requested a referral to an endocrinologist, but stated that she had no other complaints. Id. at 591. Dr. Fox diagnosed Claimant with unspecified hyperthyroidism and hypertension, prescribed her medication, and referred her to an endocrinologist. Id. at 592.

On March 25, 2014, Claimant returned to Dr. Fox and reported left knee pain for the past two months and left heel pain for the last month. Id. at 589. Dr. Fox referred Claimant to Jeffrey A. Rich, D.O. ("Dr. Rich") for orthopedic treatment, James F. Tracy, D.P.M. ("Dr. Tracy") for podiatry, an oncologist, and a sports medicine physician. Id. at 590. On August 5, 2015, Claimant complained of pain in the left side of her chest. Id. at 586. Dr. Fox referred her to a radiologist for a chest x-ray examination, which was normal. Id. at 604. He also recommended moderate cardiovascular exercise, such as brisk walking, and Claimant agreed with the plan of care. Id. at 587. Claimant returned to Dr. Fox on August 17, 2015 and complained of continued chest pain in the center part of her chest. Id. at 584. Dr. Fox diagnosed Claimant with costochondritis and prescribed her pain medication. Id.

4) <u>Dr. Rich</u>

Claimant was treated by Dr. Rich from April 22, 2014 until November 19, 2015.  <u>Id.</u> at 577-78, 625-640.  At her initial visit with Dr. Rich, Claimant reported that she had pain while climbing stairs, squatting, walking, running and exercising.  <u>Id.</u> at 577.  Upon examination, Dr. Rich noted that Claimant had swelling in both knees.  <u>Id.</u>  Claimant had pain with limited range of motion in her left knee, but a normal range of motion and no pain in her right knee.  <u>Id.</u> Claimant underwent an x-ray examination of her left knee, which revealed some osteoarthritic changes, but no acute bone abnormalities.  <u>Id.</u>

On May 6, 2014, Claimant underwent an MRI of her left knee, which revealed mild partial thickness articular cartilage loss and a small joint effusion.  <u>Id.</u> at 571.  She also had an MRI of her right knee, which revealed partial cartilage loss within the patellofemoral joint, small joint effusion, and medial gastrocnemius insertional bursitis.  <u>Id.</u> at 573.  Dr. Rich then recommended hyaluronic acid injections.  <u>Id.</u> at 632.  Claimant continued to complain of pain in follow-up visits on May 23, August 19, and December 10, 2014.  <u>Id.</u> at 630-32.

5) <u>Dr. Tracy</u>

Claimant was treated by Dr. Tracy from May 15, 2014 until December 15, 2014.  <u>Id.</u> at 608-16.  During all of her physical examinations, Dr. Tracy observed that Claimant had a non-antalgic gait and normal 5/5 muscle strength in all major muscle compartments.  <u>Id.</u> at 608-611. At her initial visit with Dr. Tracy, Claimant complained of heel pain and reported being diagnosed with a heel spur at UM Hospital.  <u>Id.</u> at 608.  Claimant stated that the pain in her heel began after she had left knee surgery to remove a tumor.  <u>Id.</u>  She underwent an x-ray examination, which revealed a heel spur on the left foot.  <u>Id.</u>  Dr. Tracy diagnosed Claimant with

calcaneal spur and plantar fasciitis, prescribed her Voltaren gel, and administered an injection to her left foot. Id. at 608, 613.

On June 11, 2014, Claimant returned for a follow-up appointment with Dr. Tracy and reported that she had been feeling better since receiving the injection. Id. at 611. Dr. Tracy again administered an injection to Claimant's left foot. Id. Claimant returned to Dr. Tracy on July 10, 2014 and reported that she had been feeling about 70 percent better since receiving the last injection. Id. at 610. Dr. Tracy again administered an injection to Claimant's left foot. Id.

On December 15, 2014, Claimant returned to Dr. Tracy for a follow-up appointment and reported that her pain had not improved since her last visit. Id. at 609.

6)      Carlos Alonso, M.D. ("Dr. Alonso")

Claimant was treated by Dr. Alonso at Advanced Rheumatology of South Florida from August 11, 2014 to March 18, 2015. Id. at 552-580. At her initial evaluation, Dr. Alonso diagnosed Claimant with osteoarthrosis in her hand and screened her for rheumatoid arthritis. Id. at 557. Claimant reported that her response to treatment had been fair and transient and that her pain was sometimes better. Id. at 559. Claimant returned to Dr. Alonso on September 9, 2014 and reported that her response to treatment was still fair and transient. Id. at 561. In regard to the rheumatoid arthritis screening, Dr. Alonso found that there was no clear evidence of an inflammatory process and that there was a low titer rheumatoid factor, but that Claimant had diffuse pains. Id. On October 16, 2014 and December 8, 2014, Claimant reported that her response to steroid treatment had been excellent. Id. at 567, 569. Dr. Alonso diagnosed Claimant with unspecified inflammatory polyarthropathy with a low titer rheumatoid factor. Id. at 565, 568. At her last appointment with Dr. Alonso on March 18, 2015, Claimant reported feeling better, but that she still had pain. Id. at 553.

8

### B. Non-Treating Sources

1) State Agency Medical Consultant P.S. Kirshnamurthy, M.D. ("Dr. Krishnamurthy")

Dr. Krishnamurthy conducted a medical disability evaluation of Claimant on March 13, 2014. Id. at 106-108. Dr. Krishnamurthy opined that Claimant could lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently; could stand and/or walk and sit for a total of 6 hours in an 8-hour work day with normal breaks; was limited in her ability to push and/or pull in the left lower extremities; could frequently climb ramps and stairs and balance; could occasionally kneel, crouch and crawl; could never climb ladders, ropes or scaffolds; and had no limitations in her ability to stoop. Id. at 106-07.

## II. Mental Health Providers

### A. Treating Sources

1) Hamlet Hassan, M.D. ("Dr. Hassan")

Claimant was treated by Dr. Hassan from August 15, 2013 to March 30, 2016 for mental health issues. Id. at 367-77, 452-56, 535-48, 644-96. At her initial psychiatric evaluation, Claimant reported a need to repeatedly check the same things or perform routines and rituals without control of her thoughts and behaviors. Id. at 372. Dr. Hassan diagnosed her with obsessive-compulsive disorder and prescribed her an anti-depressant and anti-anxiety medication. Id. at 373-74. Claimant returned on September 19, 2013 and reported that the medication did not help her and made her angry, but that she felt better regarding her obsessive-compulsive disorder. Id. at 370. Dr. Hassan diagnosed Claimant with major depressive disorder without psychotic features and adjusted her medication. Id. On October 24, 2013, Claimant returned for a follow-up appointment and reported feeling apprehensive and irritable. Id. at 368.

Claimant returned to Dr. Hassan on January 16, 2014 and reported feeling nervous and anxious. Id. at 456.  On January 29, 2014, Claimant reported decreased anxiety and depression and stated that she felt a little bit better. Id. at 454.  On March 26, 2014, Claimant told Dr. Hassan that she cried a lot and was depressed and very obsessive. Id. at 539.  In a follow-up appointment on May 21, 2014, Claimant reported that she had stopped taking one of her anti-depressants due to headache and shortness of breath, but that her episodes of depression had lessened in frequency and intensity. Id. at 543.

On June 2, 2014, Dr. Hassan completed a Medical Assessment of Claimant's Ability to Do Work-Related Activities (Mental) (hereafter, "First Mental Assessment"). Id. at 550-51.  He opined that Claimant had no useful ability to function independently; a poor ability to deal with the public, manage work stress, and maintain attention and concentration; and a fair ability to follow work rules, relate to co-workers, use judgment, interact with supervisors, and maintain personal appearance. Id. at 550-51.  He further opined that Claimant had a fair ability to understand, remember and carry out simple instructions, but a poor ability to understand, remember, and carry out complex or detailed instructions. Id. at 551.  He also concluded that Claimant had a poor ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. Id.  Dr. Hassan opined that Claimant would be unable to maintain a job. Id.

On October 15, 2014, Claimant reported that she felt better but that she still had fear, worry and anxiety. Id. at 671.  Dr. Hassan noted that Claimant was calm and cooperative, but that her levels of anxiety and depression had increased. Id.  On February 4, 2015, Claimant reported that she was still nervous, anxious and depressed, but Dr. Hassan noted that her condition was improving and continued her medication regimen. Id. at 665.  On April 29, 2015,

Claimant reported feeling better, and Dr. Hassan noted improvements in her condition. Id. at 662. Dr. Hassan noted no improvements in July and October 2015, but on November 25, 2015, Claimant reported that her depression was better. Id. at 651, 655. On January 20, 2016, Claimant stated that she felt better, but that her concentration was gone and that she felt sad. Id. at 648.

On March 30, 2016, Claimant reported that she routinely woke up with dizziness and drowsiness and with feelings that everything was going blank, but Dr. Hassan noted moderate improvement in her condition. Id. at 646. That same day, Dr. Hassan completed a second Medical Assessment of Claimant's Ability to Do Work-Related Activities (hereafter, "Second Mental Assessment") (First Mental Assessment and Second Mental Assessment, together, "Mental Assessments"). Id. at 641-42. He opined that Claimant had no useful ability to deal with the public, deal with work stress or demonstrate reliability. Id. He found that she demonstrated a poor ability to relate to co-workers, use judgment, interact with supervisors, maintain attention or concentration, behave in an emotionally stable manner, or relate predictably in social situations. Id. Dr. Hassan also concluded that Claimant had a fair ability to follow work rules, function independently, and maintain personal appearance. Id. He further opined that Claimant had a fair ability to understand, remember and carry out simple and detailed instructions, but a poor ability to understand, remember, and carry out complex instructions. Id. at 642.

Throughout the period of his treatment of Claimant, Dr. Hassan consistently noted that Claimant was oriented with fair judgment, logical thought process, intact thought content, adequate social skills and no behavioral issues. Id. at 368, 370, 373, 548, 648, 651, 659, 668.

2) <u>Mercy Hospital</u>

On January 6, 2014, Claimant was admitted to Mercy Hospital due to depression and suicidal ideation. <u>Id.</u> at 393. She exhibited symptoms of anxiety and reported difficulty staying asleep. <u>Id.</u> at 385. She also reported having less energy, no longer enjoying previously enjoyed activities, and having difficulty with concentration. <u>Id.</u> at 386. Upon mental status examination she presented as calm, fully communicative, and coherent. <u>Id.</u> at 387. She appeared unhappy, listless, anergic and downcast, and she exhibited signed of moderate depression. <u>Id.</u> Claimant was able to define several words, complete simple addition problems, interpret an abstract proverb, identify similarities, demonstrate judgment and comprehension, recall three objects, and tell time. <u>Id.</u> at 387-91. She was discharged the following day. <u>Id.</u> at 392.

**B. Non-Treating Sources**

1) <u>State Agency Psychological Consultant Arthur Hamlin, Psy.D. ("Dr. Hamlin")</u>

On December 10, 2013, Dr. Hamlin reviewed the medical evidence and opined that Claimant had mild restrictions in her activities of daily living; moderate difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration. <u>Id.</u> at 77. Dr. Hamlin further concluded that Claimant was capable of carrying out multi-step instructions; sustaining an ordinary routine without special supervision; making work-related decisions; and responding appropriately to gradual changes in the work setting. <u>Id.</u> at 81-82. He opined that Claimant would need a setting with reduced social interaction due to her history of panic and anxiety. <u>Id.</u> at 81.

2) <u>State Agency Psychological Consultant Kathryn Bell, Ph.D. ("Dr. Bell")</u>

On March 4, 2014, Dr. Bell opined that Claimant had mild restrictions in her activities of daily living; moderate restrictions in maintaining social functioning, concentration, persistence or pace; and no repeated episodes of decompensation, each of extended duration. <u>Id.</u> at 118. She further opined that Claimant was capable of carrying out simple instructions and had the ability to respond appropriately to gradual changes in the work setting. <u>Id.</u> at 123-24.

## FUNCTION REPORT

On September 4, 2013, Claimant submitted a function report in which she stated that being in motion or standing caused her great discomfort and pain. <u>Id.</u> at 249. She also stated that being among many people caused her to have panic attacks and that due to her obsessive-compulsive disorder, she felt compelled to check her work multiple times. <u>Id.</u> She stated that she was able to make her bed, groom herself, occasionally cook, and wash dishes. <u>Id.</u> at 250-51. She reported that she occasionally experienced discomfort when getting into the shower and that she would excessively wash her hands. <u>Id.</u> at 251. She also stated that she was capable of handling money, but would never feel confident that she had counted it correctly. <u>Id.</u> at 252. She stated that she was able attend religious services once a week and that she did not need anyone to remind her to go or to accompany her. <u>Id.</u> at 253. She also stated that she was able to follow written and spoken instructions well, but if the instructions were complex or long she would become confused and frustrated, causing a panic attack. <u>Id.</u> at 254.

## HEARING TESTIMONY

A hearing was held on May 11, 2016 before ALJ Leibowitz, at which Claimant and VE Fidanza testified. <u>Id.</u> at 39-67.

I.      **Claimant**

Claimant testified that she was born in Cuba and came to the United States in 1996. Id. at 43. She stated that she lived with her husband and her two children, and that she was 43 years old at the time of the hearing. Id. at 45. Claimant stated that she worked at a clothing store in a mall for 14 years. Id. at 47. Her duties included changing the lightbulbs, stocking merchandise, cleaning the bathroom, lifting boxes, putting alarms on the clothes and hanging them up, and assisting the cashier a few times. Id. at 47-49. Claimant testified that she did not deal with the public in that job. Id. at 49. According to Claimant, she quit that job because of the issues with her knees and because she would cry for no reason. Id. at 47-48.

She testified that on a typical day she would wake up in the afternoon. Id. at 51-52. She stated that she was able to cook a little, but that her sister did the house cleaning, and her husband and kids did the laundry. Id. at 52. She testified that she was able to shower by herself. Id. at 56. Claimant testified that she did not go to the grocery store because when she went she felt like she needed air and got very irritated with people. Id. at 53. She also stated that she avoided talking to her friends. Id. Claimant testified that she went to church once a week, but otherwise did not do much beyond sleeping and eating. Id. at 54. She stated that she did not like to watch television, but that when she did she was not able to concentrate or follow the plot. Id. at 58.

Claimant testified that she had a heel spur for which she underwent surgery and was prescribed special shoes. Id. at 55-56. She stated that the heaviest that she could lift was up to ten pounds. Id. at 56. She also stated that she could only walk half of a block before having to stop and that she could stand in a fixed position without moving for no more than fifteen minutes. Id. at 60. According to Claimant, she could never squat or kneel, and the pain in her

knees felt like a dog was biting them.  Id.  Claimant testified that she experienced panic attacks every two days during times when her house was crowded.  Id. at 58.  She also stated that most of the time when she was home alone she would cry.  Id. at 61.

Upon ALJ Leibowitz's questioning regarding Claimant's symptoms, the following exchange occurred:

Q:  Ma'am, why do you believe you can't work?

A:  For many reasons.  Physically is the main reason and also the emotional part.  I have many physical problems, and currently, the most part is emotional.

Q:  If you had to rate your pain today, emotional pain and physical pain on a scale of 1-10, what is your emotional pain today and your physical pain?

A:  The physical pain would be 8, and the emotional 10.

Q:  Okay.  When I hear someone say 10, I think that's supposed to be the worst pain you've ever felt in your life.  Do you want us to call the ambulance for you? You want us to call the ambulance for you?

A:  No.

Q:  Okay. That's why I'm just asking because I'm sure, you know, people come in here in a lot of pain.  We don't want them to feel uncomfortable.

A:  When I talk about the emotional pain, it's like a lot of sadness.

Id. at 51.

## II.   VE Fidanza

VE Fidanza classified Claimant's prior work as follows:

➢  Janitor, DOT #382.664-010,[6] with an exertional level of medium[7] and a Specific Vocational Preparation (hereafter, "SVP") of 3;[8]

---

[6] DOT is the acronym for the Dictionary of Occupational Titles, which was created by the Employment and Training Administration and groups jobs based on their similarities, and defines the structure and content of all listed occupations.  See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.
[7] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  20 C.F.R. §§ 404.1567(c) and 416.967(c).

> ➤ Ticketer, DOT #229.587-018, with an exertional level of light[9] and an SVP of 2;[10]

Id. at 63.

ALJ Leibowitz posed four hypotheticals to VE Fidanza about an individual of Claimant's

age, with her education and work experience who:

1) was able to work at the light exertional level; frequently push/pull; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; occasionally be exposed to vibration hazards; was limited to simple routine, repetitive tasks, but not at a production rate pace such as piece work or assembly line work; and could occasionally interact with supervisors, coworkers and the public.

2) had the same abilities as Hypothetical No. 1, except that the individual could never have interaction with the public.

3) was able to work at the sedentary exertional level; frequently push/pull; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; occasionally be exposed to vibration hazards; was limited to simple routine, repetitive tasks, but not at a production rate pace such as piece work or assembly line work; and could occasionally interact with supervisors and coworkers, but never with the public.

4) had the same abilities as in Hypothetical Nos. 1-3, except the individual's time off task was 15 percent.

Id. at 63-65.

VE Fidanza testified that the individual in Hypothetical Nos. 1 and 2 would be able to

perform Claimant's past work as ticketer, but that the individual in Hypothetical No. 3 would

---

[8] SVP is defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.
  An SVP of 3 means preparation for the job should take "[o]ver 1 month up to and including 3 months." Id.
[9] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b) and 416.967(b).
[10] An SVP of 2 means that preparation for the job should take "[a]nything beyond short demonstration up to and including 1 month." See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

not. Id. at 64.  VE Fidanza testified that the individual in Hypothetical No. 3 could perform the

following representative jobs:

> Table worker, DOT #759.687-182, with an exertional level of sedentary and
>   an SVP of 2, with 30,000 jobs in the national economy;

> Final assembler, DOT #713.687-030, with an exertional level of sedentary and
>   an SVP of 2, with 35,000 jobs in the national economy; and

> Semiconductor bonder, DOT #726.685-066, with an exertional level of
>   sedentary and an SVP of 2, with 55,000 jobs in the national economy.

Id.  VE Fidanza further testified that there would be no jobs that the individual in Hypothetical

No. 4 could perform because once a person's time off task exceeds 10 percent, they would be

unable to sustain employment.  Id. at 65.

VE Fidanza testified that a hypothetical individual with the limitations set forth in Dr.

Hassan's Mental Assessments would not be able to sustain Claimant's past relevant work or any

other work.  Id. at 65-66.

## STANDARD OF REVIEW

A federal court's "review of a social security case is demarcated by a deferential

reconsideration of the findings of fact and exacting examination of the conclusions of law."

Williams v. Astrue, 416 F. App'x 861, 862 (11th Cir. 2011).  Thus,

> [t]he Commissioner's findings of fact are conclusive if supported by substantial
> evidence.  42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e.,
> the evidence must do more than merely create a suspicion of the existence of a
> fact, and must include such relevant evidence as a reasonable person would accept
> as adequate to support the conclusion. Where the Commissioner's decision is
> supported by substantial evidence, the district court will affirm, even if the
> reviewer would have reached a contrary result as finder of fact, and even if the
> reviewer finds that the evidence preponderates against the Commissioner's
> decision.

Kieser v. Barnhart, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) (citations omitted).  However,

the Commissioner's "conclusions of law, including applicable review standards, are not

presumed valid." <u>Williams</u>, 416 F. App'x at 862.

### REGULATORY FRAMEWORK:  THE FIVE-STEP SEQUENTIAL PROCESS

The Social Security Regulations outline a five-step "sequential" evaluation process used to determine whether a claimant is disabled.

First, the ALJ must determine whether a claimant is engaged in "substantial gainful activity" (hereafter, "SGA").  If the ALJ finds that the claimant is engaging in SGA, then the ALJ must find that the claimant is not disabled.  <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1237 (11th Cir. 2004).  In this case, ALJ Leibowitz determined that Claimant had not engaged in SGA since the alleged onset date of May 31, 2013, and proceeded to step two. TR. 21.

At the second step, the ALJ must determine if a claimant's impairments are "medically severe."  If the ALJ determines that the claimant's impairments are medically severe, then he or she must proceed to the third step.  <u>Phillips</u>, 357 F.3d at 1237.  In this case, ALJ Leibowitz found that Claimant suffered from the following severe impairments: mild lumbar degenerative disc disease at L5-S1; left foot plantar fasciitis; bilateral knee cartilage loss; osteoarthrosis; status-post left knee cystic mass excision and left knee meniscus tear repair; depression; obsessive-compulsive disorder; and anxiety.  TR. 21.  ALJ Leibowitz then proceeded to step three.  <u>Id.</u> at 22.

At step three, the ALJ must determine if a claimant's impairment(s) "meet or equal" any of the listed impairments in the regulations.  <u>Phillips</u>, 357 F.3d at 1238.  If so, the ALJ must find the claimant disabled; if not, then the ALJ should proceed to step four.  <u>Id.</u>  Here, ALJ Leibowitz determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  TR. 22.  Therefore, ALJ Leibowitz proceeded to step four.  <u>Id.</u> at 24.

Step four is a two-pronged process, which first requires the determination of a claimant's RFC and then, based on that RFC, a determination of whether the claimant can return to any "past relevant work." Phillips, 357 F.3d at 1238.   As to the first prong, ALJ Leibowitz determined that Claimant had the RFC:

> to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except she can frequently push or pull; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, kneel, stoop, crouch and crawl; she was limited to occasional exposure to vibration; occasional exposure to hazards; she was limited to simple, routine, and repetitive tasks but not at a production rate pace such a piece work or assembly line work; occasional interaction with supervisors and coworkers; she was precluded from any interaction with the general public.

TR. 24.   Based on Claimant's RFC, ALJ Leibowitz moved to prong two of step four and concluded that Claimant was not able to perform any past relevant work. Id. at 31.   ALJ Leibowitz then proceeded to the fifth and final step. Id.

Step five requires the ALJ to determine whether the claimant is able to do any work considering the claimant's age, education, work experience, and RFC. Phillips, 357 F.3d at 1239-40.   ALJ Leibowitz determined that, given Claimant's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy which Claimant could perform. TR. 31.   Therefore, ALJ Leibowitz concluded that Claimant was not under a disability, as defined in the Social Security Act, from May 31 2013, through the date of the Unfavorable Decision. Id. at 33.

## DISCUSSION

Because Claimant's third argument contains two distinct arguments, the undersigned reorganizes Claimant's arguments as follows:

I.      The ALJ failed to properly assess opinion evidence of record.

II.     The ALJ's RFC assessment was not supported by substantial evidence.

19

III.     The ALJ did not properly assess Claimant's subjective statements.[11]

IV.     The ALJ's comments during the hearing establish bias.

See Claimant's Motion for Summary Judgment [D.E. 17].  The undersigned finds no merit in any

of the contentions.

## I.   Whether ALJ Leibowitz properly assessed opinion evidence of record

"Medical opinions are statements from physicians and psychologists or other acceptable

medical sources that reflect judgments about the nature and severity of the claimant's

impairment(s), including the claimant's symptoms, diagnosis and prognosis, what the claimant

can still do despite impairment(s), and the claimant's physical or mental restrictions."  Winschel

v.  Comm'r of Soc. Sec., 631 F.3d 1176, 1178-79 (11th Cir. 2011) (quoting 20 C.F.R. §

404.1527(a)(2)).  An ALJ is "required to state with particularity the weight [given to] the

different medical opinions and the reasons therefor."  Sharfarz v. Bowen, 825 F.2d 278, 279

(11th Cir. 1987).  "In the absence of such a statement, it is impossible for a reviewing court to

determine whether the ultimate decision on the merits of the claim is rational and supported by

substantial evidence."  Winschel, 631 F.3d at 1179 (quoting Cowart v. Schweiker, 662 F.2d 731,

735 (11th Cir. 1981)).

"The opinion of a treating physician . . . must be given substantial or considerable weight

unless 'good cause' is shown to the contrary."  Phillips, 357 F.3d at 1240 (citation and quotation

marks omitted).  The Eleventh Circuit has held that "good cause" exists where the:  (1) treating

physician's opinion was "not bolstered by the evidence;" (2) "evidence supported a contrary

---

[11] Although Claimant refers to the ALJ's purported credibility assessment and bases her argument on SSR 96-7p, see Claimant's Motion for Summary Judgment [D.E. 17 at 23], SSR 16-3p rescinded SSR 96-7p and eliminated the term "credibility" from SSA's sub-regulatory policy.  82 Fed. Reg. at 49,463. Accordingly, the undersigned construes Claimant's argument as challenging ALJ Leibowitz's assessment of Claimant's subjective statements, rather than her credibility.

finding;" or (3) the treating physician's opinion was "conclusory or inconsistent with their own medical records." Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). "When the ALJ has articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error." Weekley v. Comm'r of Soc. Sec., 486 F. App'x 806, 808 (11th Cir. 2012) (citing Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005)).

ALJ Leibowitz assigned "great weight" to the portion of Dr. Hassan's First Mental Assessment where he opined that Claimant had a fair ability to follow work rules, relate to co-workers, use judgment, interact with supervisors, and understand, remember and carry out simple instructions; and a poor ability to deal with the public and understand, remember, and carry out complex or detailed instructions. TR. 28 (citations omitted). ALJ Leibowitz assigned "partial weight" to the remainder of Dr. Hassan's First Mental Assessment, in which he opined that Claimant had no useful ability to function independently; manage work stress, maintain attention and concentration, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability; and would be unable to maintain a job. Id. ALJ Leibowitz concluded that these opinions were inconsistent with the record as a whole. Id. ALJ Leibowitz further explained that:

> Dr. Hassan opined that the claimant has no ability to function independently or maintain attention or concentration. However, the claimant reported that she is able to cook, clean, go to church, and leave her house unaccompanied. Additionally . . . Dr. Hassan consistently noted the claimant had fair judgment, insight, thought process, and thought content despite her mental impairments.

Id. (citations omitted).

As to the Second Mental Assessment completed by Dr. Hassan, ALJ Leibowitz gave "great weight" to his opinion that Claimant had no useful ability to deal with the public; had a

poor ability to relate to co-workers, interact with supervisors, and to understand, remember, and carry out complex instructions; and had a fair ability to function independently and understand, remember, and carry out simple and detailed instructions. Id. at 28-29 (citations omitted). However, she gave "partial weight" to the remainder of Dr. Hassan's Second Mental Assessment, in which he opined that Claimant had no useful ability to deal with work stress or demonstrate reliability; had a poor ability to use judgment, maintain attention or concentration, behave in an emotionally stable manner, or relate predictably in social situations; and had a fair ability to follow work rules and maintain personal appearance. Id. at 29 (citations omitted). ALJ Leibowitz explained that these opinions were inconsistent with the record as a whole. Id. ALJ Leibowitz further explained that:

> Dr. Hassan consistently noted that the claimant showed signs of depression or anxiety but still noted she had good judgment, insight, thought process, and thought content. Dr. Hassan also noted the claimant [had] no behavioral issues. Further, he noted that after the claimant started treatment her condition improved. Lastly, even during the claimant's psychiatric admission the claimant demonstrated good judgment and comprehension at a time of a mental health exacerbation and the record shows her condition improved with treatment.

Id. (citations omitted).

Claimant argues that ALJ Leibowitz accorded inadequate weight to the Mental Assessments completed by Dr. Hassan. See Claimant's Motion for Summary Judgment [D.E. 17 at 19-21]. However, as set forth above, ALJ Leibowitz articulated "good cause" for assigning certain portions of Dr. Hassan's opinions "partial weight;" and supported her decision with "such relevant evidence as a reasonable person would accept as adequate to support the conclusion from the record." Kieser, 222 F. Supp. 2d at 1305. Therefore, there is no basis to assign error. Weekley, 486 F. App'x at 808; Lewis, 125 F.3d at 1440; Phillips, 357 F.3d at 1240.

Claimant also argues that ALJ Leibowitz accorded insufficient weight to VE Fidanza's testimony because she did not refer to the answers that VE Fidanza gave in response to the hypotheticals posed by Claimant's counsel.  See Claimant's Motion for Summary Judgment [D.E. 17 at 22].  However, an ALJ is only required to articulate the weight given to medical opinions.  Sharfarz, 825 F.2d at 279.  Moreover, an ALJ is "not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported." Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1161 (11th Cir. 2004).  Accordingly, the undersigned finds no merit to this contention.[12]

## II.   Whether ALJ Leibowitz's RFC assessment was supported by substantial evidence

"The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p.[13]  "[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is not enough to enable [the court] to conclude that the ALJ considered [Claimant's] medical condition as a whole."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  When substantial evidence supports the ALJ's decision, it must be affirmed.  See Crawford, 363 F.3d at 1158-59.

---

[12] In support of her argument that the ALJ improperly assessed opinion evidence, Claimant also contends that some of ALJ Leibowitz's statements during the hearing were "disrespectful" and reflected a misunderstanding of Claimant's condition.  See Claimant's Motion for Summary Judgment [D.E. 17 at 22].  However, Claimant's argument is so perfunctory that it is deemed waived due to inadequate briefing.  See N.L.R.B. v. McClain of Ga., Inc., 138 F.3d 1418, 1422 (11th Cir. 1998) ("Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived.").

[13] SSR 96-8p sets forth the SSA's policies and policy interpretations regarding the assessment of a claimant's RFC.  SSR 96-8p, 1996 WL 374184 (July 2, 1996).  According to this policy interpretation, the Commissioner is required to consider all relevant evidence in the case record in making the RFC determination.  Id.; see also Lewis, 125 F.3d at 1440 ("The [RFC] is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments.") (citing 20 C.F.R. § 404.1545(a)).

Claimant argues that ALJ Leibowitz's RFC assessment is inconsistent with the substantial evidence of record because ALJ Leibowitz improperly discounted Dr. Hassan's opinions that show that Claimant was "suffering from mental, as well as physical, impairments that prevent her from working." See Claimant's Motion for Summary Judgment [D.E. 17 at 23]. However, as discussed above, ALJ Leibowitz did not err in assessing the opinion evidence of record.   Therefore, ALJ Leibowitz's RFC assessment was supported by substantial evidence. Kieser, 222 F. Supp. 2d at 1305.

**III.     Whether ALJ Leibowitz improperly evaluated Claimant's subjective statements**

When considering a claimant's symptoms, the ALJ must follow a two-step process: "Step one is to determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms." Contreras-Zambrano v. Soc. Sec. Admin., Comm'r, No. 17-12447, 2018 WL 618420, at *3 (11th Cir. Jan. 30, 2018) (citing SSR 16-3p, 82 Fed. Reg. 49,462, 49,463-64 (Oct. 25, 2017)).   "Step two is to evaluate the intensity and persistence of an individual's symptoms, such as pain, and determine the extent to which an individual's symptoms limit her ability to perform work-related activities." Id. (citing SSR 16-3p, 82 Fed. Reg. at 49,464-66).   An ALJ considers "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the individual's] statements and the rest of the evidence, including [her] history, the signs and laboratory findings, and statements by [her] medical sources or other persons about how [her] symptoms affect [her]." 20 C.F.R. § 404.1529(c)(4).   SSR 16-3p, effective March 28, 2016, clarified that "subjective symptom evaluation is not an examination of an individual's character." 82 Fed. Reg. at 49,463.

ALJ Leibowitz found that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not completely consistent with the medical evidence and other evidence in the record . . . ." TR. 25.   ALJ Leibowitz explained that:

> Although the claimant has several severe impairments that cause her several limitations, the claimant's limitations are no greater than those contained in the RFC.  The claimant's MRI of her lumbar spine described her degenerative disc disease as mild and only at her L5-S1 with no foraminal or central canal stenosis. Further, the claimant reported that over the counter Ibuprofen controls her back pain and that she does not need to take it every day.  She also rated her back pain as 0/10 and reported only having intermittent right leg numbness.

> Additionally, the claimant reported while treating that steroids and medication were doing an excellent job controlling her pain in her lower extremities.  The claimant subsequently described the pain as mild after stating steroids and medication helped her pain.  Similarly, her treatment notes also stated she was responding well to conservative treatment.   Likewise, the debridement of the claimant's left foot was described as having a positive result.  Physical exams also consistently noted the claimant had normal 5/5 strength in her extremities and joint stability despite having her impairments.  The claimant's gait was also noted to be normal . . . . Further, although the claimant denied exercising and running, her treatment notes stated the claimant reported she had pain while exercising and running.  Similarly, in August 2015 the claimant was advised to briskly walk and do moderate cardiovascular exercise for two and a half hours per week and the claimant agreed with the plan of care.

> Furthermore, the record shows that despite having her mental impairments, the claimant was consistently noted to be oriented with fair judgment, insight, thought process, and thought content.  She was also noted to have adequate social skills and no behavioral issues.  Additionally, the record shows that the claimant's treatment helped improve her mental impairments.  In May 2014, the claimant was noted to have less frequent and less intense episodes of depression. Additionally, in April 2015, Dr. Hassan noted the claimant's mental impairments had significantly improved.  The claimant also reported that she can follow both written and spoken instructions as long as they are not too complex.  Lastly, the claimant also reported doing better with decreased symptoms.

Id. at 30-31 (citations omitted).

Citing to SSR 96-7p, Claimant argues that ALJ Leibowitz's assessment of Claimant's testimony was improper because the Unfavorable Decision never explicitly stated whether or not Claimant was credible.   See Claimant's Motion for Summary Judgement [D.E. 17 at 23]. However, the applicable standard is set forth in SSR 16-3p, not SSR 96-7p.   See 82 Fed. Reg. at 49,463.   Thus, ALJ Leibowitz properly declined to determine whether or not Claimant was credible. Id.; Contreras-Zambrano, 2018 WL 618420, at *3.

To the extent that Claimant challenges ALJ Leibowitz's assessment of Claimant's statements pursuant to SSR 16-3p, ALJ Leibowitz discussed how Claimant's statements regarding her physical pain and mental impairments were inconsistent with the objective medical evidence of record.   TR. 30-31.   Because ALJ Leibowitz supported her findings regarding Claimant's allegations of the intensity, persistence, and limiting effects of her symptoms with substantial evidence, the undersigned finds no basis to assign error.   See Kieser, 222 F. Supp. 2d at 1305.

## IV.   Whether the ALJ's statements during the hearing establish bias

A "claimant is entitled to a hearing that is both full and fair."   Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996).   There is a "presumption of honesty and integrity in those serving as adjudicators."   Withrow v. Larkin, 421 U.S. 35, 47 (1975).   "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge."   Liteky v. United States, 510 U.S. 540, 555 (1994).   Bias is not established by "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display."   Martinez v. Acting Comm'r of Soc. Sec., 660 F. App'x 787, 794 (11th Cir.

26

2016) (quoting <u>Liteky</u>, 510 U.S. at 555-56) (finding that comments made by the ALJ during the hearing were not sufficient to establish bias).

Claimant argues that ALJ Leibowitz demonstrated bias when she asked Claimant to rate her emotional pain and then asked if Claimant needed an ambulance. <u>See</u> Claimant's Motion for Summary Judgment [D.E. 17 at 22-23]; TR. 51.   Applying the foregoing standards, the undersigned concludes that these comments do not constitute bias. <u>See</u> <u>Liteky</u>, 510 U.S. at 555; <u>Martinez</u>, 660 F. App'x at 794.   Thus, there is no basis to assign error.

## **RECOMMENDATION**

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that Claimant's Motion for Summary Judgment [D.E. 17] be DENIED, the Commissioner's Motion for Summary Judgment [D.E. 22] be GRANTED, and the Commissioner's decision be AFFIRMED.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Darrin P. Gayles, United States District Judge.   Failure to file timely objections may bar the parties from attacking the factual findings contained herein on appeal. <u>See</u> <u>Resolution Tr. Corp.</u> <u>v. Hallmark Builders, Inc.</u>, 996 F.2d 1144, 1149 (11th Cir. 1993).   Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." <u>See</u> 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida, this 1ˢᵗ day of August, 2018.

_____
ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:    United States District Judge Darrin P. Gayles
       Counsel of Record